The Honorable John H. Chun

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

LAFFON GLYMPH,

    Plaintiff,

v.

CT CORPORATION SYSTEMS and COMPUCOM,

    Defendants.

Case No. 2:21-cv-01704-JHC

**DEFENDANT COMPUCOM SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT**

NOTE ON MOTION CALENDAR:
December 30, 2024

## I.    INTRODUCTION AND RELIEF REQUESTED

Defendant CompuCom Systems, Inc. ("CompuCom") respectfully moves the Court for a summary judgment order dismissing Plaintiff Laffon Glymph's sole remaining claim with prejudice. Ms. Glymph filed her remaining claim under the federal Family and Medical Leave Act ("FMLA"), 29 U.S.C §§ 2601, *et seq.*, after the statute of limitations had already expired. When this Court dismissed her FMLA claim on that basis, it was revived by the Ninth Circuit. That court held that Ms. Glymph's claim could proceed because, as an unrepresented party, she had a lower pleading burden than a normal litigant. But we are no longer at the pleading stage of this case. Now, after discovery, no genuine factual issue exists for a trial on whether CompuCom "willfully" violated the FMLA. Ms. Glymph's brief tenure at CompuCom was characterized by ongoing serious performance issues and chronic, severe absenteeism. As a result, CompuCom

COMPUCOM'S MOTION FOR SUMMARY JUDGMENT
No. 2:21-cv-01704-JHC     - 1 -

HOLT LEGAL, P L L C
705 2nd Avenue, Suite 1200
Seattle, Washington  98104-1798
(206) 372-6261

placed Ms. Glymph on a formal Performance Improvement Plan (PIP). But Ms. Glymph's performance did not improve—it deteriorated. When CompuCom extended Ms. Glymph's PIP, she requested *and received* FMLA-protected leave. She then returned to her same position without issue. Her performance again did not improve but, instead, continued to worsen. At that point, CompuCom terminated her employment for the ongoing, objectively documented performance and attendance issues that long predated her leave, and which did not improve at all after she returned from it. Ms. Glymph's discharge had nothing to do with her leave. No evidence exists that it did. While Ms. Glymph's unsupported allegations might be sufficient for a *pro se* litigant under the Rule 12(b)(6) standard, they are not sufficient on summary judgment in federal court, where Ms. Glymph must produce material, probative evidence supporting her claims. No evidence exists. As such, CompuCom is entitled to judgment as a matter of law.

The Court should grant CompuCom's motion and dismiss this case.

## II.   FACTS

### A.   Ms. Glymph's Short and Troubled Employment at CompuCom

#### 1.   Ms. Glymph's Initial Employment

Ms. Glymph worked for the eXcell division of CompuCom. November 26, 2024 Declaration of Brady Ruck in Support of CompuCom's Motion for Summary Judgment ("Nov. 2024 Ruck Decl."), Ex. 1 ("Oct. 2019 Ruck Decl."), ¶ 1.[1] As a company, eXcell provides hourly contract labor staffing services. Oct. 2019 Ruck Decl., ¶ 9. eXcell offered Ms. Glymph a temporary contract position as a Payroll Analyst on March 1, 2017. *Id.* at ¶ 2. She began work in that position on March 6, 2017. *Id.* For the entire time Ms. Glymph was employed with eXcell, her direct supervisor was its Director of Finance and Business Operations, Brady Ruck. *Id.* ¶ 1; Nov. 2024 Ruck Decl., ¶ 2; *see also* Declaration of Thomas P. Holt in Support of CompuCom's Motion for

---

[1] Mr. Ruck originally executed a sworn declaration related to Ms. Glymph on October 24, 2019, while still employed with CompuCom. Nov. 2024 Ruck Decl., ¶ 3; *see also* Oct. 2019 Ruck Decl., at p.6. Given the intervening time, Mr. Ruck (now employed elsewhere) has executed a current declaration readopting his prior sworn statements and affirming his continued willingness to attest to the facts set forth in that document at trial. *See* Nov. 2024 Ruck Decl., ¶ 3.

COMPUCOM'S MOTION FOR
SUMMARY JUDGMENT
No. 2:21-cv-01704-JHC          - 2 -

HOLT LEGAL, P L L C
705 2nd Avenue, Suite 1200
Seattle, Washington 98104-1798
(206) 372-6261

Summary Judgment ("Holt Decl."), Ex. 1 (transcript of Nov. 7, 2024 deposition of Plaintiff Laffon Glymph, "Glymph Dep."), at 35:13–19.

After an initial period of generally acceptable job performance, eXcell converted Ms. Glymph's contract position to a full-time, regular Payroll Analyst (Finance II) position on May 27, 2017. Oct. 2019 Ruck Decl., ¶ 2. Ms. Glymph worked in this position for her entire remaining time at eXcell. Glymph Dep. at 34:20–35:8.

Almost immediately after eXcell converted Ms. Glymph's position, her job performance declined. Oct. 2019 Ruck Decl., ¶ 3. Ms. Glymph began failing to meet basic job expectations. *Id.* She also began showing up to work later and later, and leaving earlier in the day, even when she still had significant work to complete. *Id.* She also began to miss deliverables and fail to complete assigned tasks on time. *Id.*

Mr. Ruck addressed these issues with Ms. Glymph on numerous occasions. *Id.* ¶ 4. But she did not improve. *Id.* To the contrary, Ms. Glymph's performance continued to worsen. *Id.*

**2.    Ms. Glymph's 2017 Performance Review and Ongoing Performance Issues**

On February 2, 2018, Mr. Ruck met with Ms. Glymph to deliver her 2017 performance review. *Id.* ¶ 5. During this meeting, Mr. Ruck explained to Ms. Glymph that, on average, she was meeting expectations, but that this overall average was only due to her generally good performance at the beginning of her time at eXcell. *Id.* Mr. Ruck explained to Ms. Glymph that after this initial period, her work performance had declined to the point where she was no longer meeting expectations. *Id.* Mr. Ruck told Ms. Glymph that if her performance did not improve, it was going to be a problem. *Id.*

Unfortunately, Ms. Glymph's performance did not improve. *Id.* ¶ 8. Far from it, her work quality continued to decline. *Id.* Mr. Ruck began to receive complaints from team members that Ms. Glymph was not completing important tasks and was not available to address issues or concerns when they arose. *Id.*

COMPUCOM'S MOTION FOR
SUMMARY JUDGMENT
No. 2:21-cv-01704-JHC                - 3 -

HOLT LEGAL, P L L C
705 2nd Avenue, Suite 1200
Seattle, Washington 98104-1798
(206) 372-6261

Because eXcell's work involves placing employees with other businesses and handling payroll for those employees, payroll is a significant part of the work at eXcell. *Id.* ¶ 9. As a Payroll Analyst, Ms. Glymph played an important part in this service and had numerous time-sensitive responsibilities. *Id.* One of these responsibilities was payroll onboarding. *Id.* Payroll onboarding must be performed daily so that new employees can record their hours worked on the jobs where they are placed. *Id.* During the period following Ms. Glymph's performance review, in early 2018, managers reached out to Mr. Ruck numerous times to complain that new employees could not enter their work hours because Ms. Glymph had not completed the payroll onboarding for them. *Id.*

Mr. Ruck counseled Ms. Glymph multiple times about this issue, explaining to her that payroll onboarding had to be completed daily, and why this is so. *Id.* ¶ 10. In spite of this explicit counseling and instruction, Ms. Glymph did not start doing the payroll onboarding daily, as Mr. Ruck had requested. *Id.* Instead, she continued to do the payroll onboarding weekly, in batches, resulting in continued manager complaints about employees being unable to enter their work hours in eXcell's payroll system and, in some instances, employees not being paid on time. *Id.*

**3.     Ms. Glymph's Chronic Lateness Creates Significant Operational Problems**

In addition, Ms. Glymph developed very significant time and attendance issues. *Id.* ¶ 11. Ms. Glymph was scheduled to begin work at 9:30 a.m. every day. *Id.* But Ms. Glymph rarely arrived to work on time. *Id.* She would routinely show up to work at 10:30 a.m. or later, sometimes even as late as noon. *Id.* She frequently sent Mr. Ruck text messages in the morning stating that she was working from home. *Id.* But this often appeared to be simply untrue; when Mr. Ruck checked the Microsoft Lync system in the company's email accounts, or Skype, these systems showed that Ms. Glymph was not even logged in to her computer when she claimed to be working. *Id.*

CompuCom's Bellevue eXcell facility had a secure entrance and maintained employee badge swipe records in the ordinary course of business. Nov. 2024 Ruck Decl., ¶ 4. Mr. Ruck requested that CompuCom's information technology personnel download Ms. Glymph's badge

COMPUCOM'S MOTION FOR
SUMMARY JUDGMENT
No. 2:21-cv-01704-JHC            - 4 -

HOLT LEGAL, P L L C
705 2nd Avenue, Suite 1200
Seattle, Washington  98104-1798
(206) 372-6261

swipe records. *Id.* Ms. Glymph's badge swipe records showed that Ms. Glymph arrived to work after 10:00 a.m. (more than 30 minutes after her scheduled start time) *97 times* between January 4, 2018, and October 2, 2018. Nov. 2024 Ruck Decl., Ex. 2. According to her badge swipe records, Ms. Glymph arrived to work after 11:00 a.m. (more than 90 minutes after her scheduled shift) six times during this period. *Id.* On two of these occasions, Ms. Glymph arrived after 11:30 a.m., a full two hours after she was scheduled to begin work. *Id.* These same badge swipe records show that Ms. Glymph arrived to work on time (by 9:30 a.m.) *only three times* during this entire period, on February 9, 2018, May 16, 2018, and September 21, 2018. *Id.* She arrived within 20 minutes of her scheduled start time (by 9:50 a.m.) on only three other occasions, on February 8, 2018, February 28, 2018, and June 25, 2018. *Id.* On *every other day* she attended work during this period, she arrived more than 20 minutes late, usually much more. *Id.*

Ms. Glymph's failure to come to work on time and her early departures from work began to create significant problems for eXcell's corporate payroll team. Oct. 2019 Ruck Decl., ¶ 12. Specifically, for eXcell's biweekly payroll runs, the Payroll Analyst (Ms. Glymph) was required to send in the hours of employees for the full division to the corporate payroll team by Monday. *Id.* The eXcell Payroll Analyst and corporate payroll team were then supposed to use Tuesdays to make any needed adjustments to payroll. *Id.* Wednesday at 10:00 a.m. was the deadline for the corporate payroll team to send the final complete payroll to the bank so all employees received their pay on time. *Id.* This schedule resulted in corporate payroll team members often having questions about specific payroll issues on Tuesday afternoons, questions that needed immediate answers. *Id.* These questions related directly to Ms. Glymph's work as a Payroll Analyst and fielding them was a core function of Ms. Glymph's job. *Id.*

However, because Ms. Glymph also routinely left work early, she was frequently unavailable to answer these questions when they arose on Tuesday afternoons. *Id.* ¶ 13. And because Ms. Glymph almost always failed to arrive at work as scheduled by 9:30 a.m., and indeed rarely arrived at work before 10:00 a.m., she was also not available to field these questions about

COMPUCOM'S MOTION FOR
SUMMARY JUDGMENT
No. 2:21-cv-01704-JHC — - 5 -

HOLT LEGAL, P L L C
705 2nd Avenue, Suite 1200
Seattle, Washington 98104-1798
(206) 372-6261

her work before the 10:00 a.m. Wednesday deadline to submit payroll to the bank. *Id.* As a result, because she was functionally completely unavailable, the corporate payroll team was frequently unable to get timely answers to questions and often had to make assumptions about work that Ms. Glymph had performed. *Id.* This, in turn, resulted in contractors getting paid incorrectly. *Id.*

Mr. Ruck counseled Ms. Glymph repeatedly about this issue and about needing to arrive at work on time, or at a minimum to be available to answer questions about payroll on Wednesday mornings. *Id.* at ¶ 14. But Ms. Glymph's attendance and performance still did not improve. *Id.*

### 4. Mr. Ruck Places Ms. Glymph on an Initial Performance Improvement Plan

On July 30, 2018, Mr. Ruck placed Ms. Glymph on a performance improvement plan (PIP). *Id.* ¶ 15; *see also* Nov. 2024 Ruck Decl., Ex. 3 (email delivering PIP). This PIP was initially to last from July 30, 2018, to August 30, 2018. Oct. 2019 Ruck Decl., ¶ 15; Nov. 2024 Ruck Decl., Ex. 4 (PIP document). The PIP specifically detailed Ms. Glymph's performance and attendance problems that Mr. Ruck had observed as her manager, and laid out his expectations for specific improvements that she needed to make. Oct. 2019 Ruck Decl., ¶ 15. One of the key expectations in the PIP was that Ms. Glymph would arrive to work no later than 10:00 a.m. *Id.*; *see also* Nov. 2024 Ruck Decl., Ex. 4 ("You must report to the office no later than 10:00AM Monday through Friday unless otherwise discussed and approved by [Mr. Ruck] or when using PTO. Working from home must be requested and approved in advance. If not requested and approved in advance, you will have to use PTO for that time.").

As reflected in Ms. Glymph's badge swipe records, despite being placed on a formal PIP based on (in substantial part) her late attendance and the chaos it was causing, she continued to arrive at work well after 10:00 a.m. *See* Nov. 2024 Ruck Decl., Ex. 2.

### 5. Ms. Glymph Fails to Attend Her PIP Review Meeting with Mr. Ruck

Mr. Ruck scheduled a meeting with Ms. Glymph for August 31, 2018, to address whether she had met the expectations set out in her PIP. Oct. 2018 Ruck Decl., ¶ 18. On the morning of August 31, 2018, however, Ms. Glymph emailed Mr. Ruck to inform him that she would not be

COMPUCOM'S MOTION FOR
SUMMARY JUDGMENT
No. 2:21-cv-01704-JHC            - 6 -

HOLT LEGAL, P L L C
705 2nd Avenue, Suite 1200
Seattle, Washington 98104-1798
(206) 372-6261

coming into work that day because she had to be in court. *Id.* Her message did not elaborate. *Id.* Ms. Glymph had not previously informed Mr. Ruck of any court obligation, jury service, or any other conflict that would have prevented her from attending the meeting about the PIP. *Id.*

### 6. Ms. Glymph Refuses to Participate in Her Updated PIP

Mr. Ruck was out of the office for the next two weeks because his mother-in-law was in hospice care, and then passed away. *Id.* ¶ 19. Because of this, Mr. Ruck was not able to further address Ms. Glymph's performance issues until September 14, 2018, when he returned to work. *Id.* When he returned, Mr. Ruck re-scheduled the meeting with Ms. Glymph—to address his expectations set forth in the PIP—for September 17, 2018. *Id.* The meeting happened; during the meeting, Mr. Ruck reiterated his expectation that Ms. Glymph would report to the office no later than 10:00 a.m. unless he approved otherwise in advance. *Id.* Mr. Ruck also reiterated his expectations regarding Ms. Glymph's substantive job performance, including updating payroll on a daily basis and communicating clearly with coworkers. *Id.* Finally, he told Ms. Glymph that they would set a projected review of Ms. Glymph's progress in meeting Mr. Ruck's expectations for October 5, 2018. *Id.* Mr. Ruck memorialized these expectations in an updated PIP that he delivered to Ms. Glymph two days later, on September 19, 2018. *Id.*; *see also* Nov. 2024 Ruck Decl., ¶ 6 (correcting date); Ex. 5 (updated PIP document).

Ms. Glymph did not commit to improving her performance either during the September 17, 2018 meeting or in response to the September 19, 2018 updated PIP. Oct. 2019 Ruck Decl., ¶ 21. Ms. Glymph took no ownership of either her time and attendance problems or her substantive performance problems. *Id.* Instead, during the September 17th meeting, Ms. Glymph took issue with the PIP because it did not memorialize what she considered to be her positive attributes. *Id.* Ms. Glymph also asserted, without evidence, that other eXcell employees were maliciously accessing eXcell's payroll software, Replicon, in order to undo what she claimed was her timely work in setting up contractor payroll onboarding. *Id.* Ms. Glymph refused to sign the updated PIP. *Id.*

COMPUCOM'S MOTION FOR
SUMMARY JUDGMENT
No. 2:21-cv-01704-JHC - 7 -

HOLT LEGAL, P L L C
705 2nd Avenue, Suite 1200
Seattle, Washington 98104-1798
(206) 372-6261

Then, instead of working to improve her performance, on September 21, 2018, Ms. Glymph sent Mr. Ruck what she characterized as her "response" to the PIP. *Id.* ¶ 22; *see also* Nov. 2024 Ruck Decl., ¶ 7, Ex. 6. In this document, Ms. Glymph asserted that her performance issues arose from what she characterized as a "critical health condition." *Id.* The document included what appeared to be the text of emails copied and pasted into it, with commentary added by Ms. Glymph. *See* Nov. 2024 Ruck Decl., Ex. 6. These emails, dated from June 13 to June 19, 2018, consisted of Ms. Glymph emailing Mr. Ruck to state that she was working from home because she was taking antibiotics that were making her feel ill. Oct 2019 Ruck Decl., ¶ 22. In response to these emails, Ms. Glymph had been permitted to work from home without issue. *Id.* Nothing in the emails indicated any kind of ongoing health condition or any difficulty with any aspect of Ms. Glymph's work, let alone that Ms. Glymph was experiencing some kind of ongoing health condition that impaired her ability to do her job. *Id.* The "response" did not otherwise explain Ms. Glymph's failure to come to work according to her work schedule, or her failure to perform basic job duties, such as daily setup of contractor payroll in Replicon. *Id.*

On October 3, 2019, Mr. Ruck provided his explanations regarding the points raised in Ms. Glymph's "response" to her PIP. *Id.* ¶ 23; *see also* Nov. 2024 Ruck Decl., ¶ 8, Ex. 7 (document). In this document, Mr. Ruck also provided extensive concrete examples substantiating his concerns about Ms. Glymph's performance. Oct. 2019 Ruck Decl., ¶ 23; Nov. 2024 Ruck Decl., Ex. 7.

**7.     Ms. Glymph's Performance and Attendance Worsen Further**

After this communication, Ms. Glymph's performance still did not improve. Oct. 2019 Ruck Decl., ¶ 24. Far from it. *Id.* Ms. Glymph continued to fail to come to work by 10:00 a.m. as required by her PIP. *Id.*; *see also* Nov. 2024 Ruck Decl., Ex. 2 (badge swipe records). She also still routinely failed to perform basic job functions, or to communicate satisfactorily about her work. Oct. 2019 Ruck Decl., ¶ 24. Moreover, during this period, Ms. Glymph became extremely hostile and confrontational not only with Mr. Ruck, but with other employees as well. *Id.* Mr. Ruck received numerous complaints from other employees that they did not want to attend meetings if

COMPUCOM'S MOTION FOR
SUMMARY JUDGMENT
No. 2:21-cv-01704-JHC          - 8 -

HOLT LEGAL, P L L C
705 2nd Avenue, Suite 1200
Seattle, Washington 98104-1798
(206) 372-6261

Ms. Glymph was going to be in them because of Ms. Glymph's behavior. *Id.* Whenever anyone on the team asked Ms. Glymph about the status of projects, Ms. Glymph would lash out at them. *Id.* Other employees approached Mr. Ruck and requested to work from home so that they would not have to work with Ms. Glymph. *Id.*

### 8.   Ms. Glymph Takes FMLA Leave

On October 15, 2018, Ms. Glymph went on leave. *Id.* ¶ 25; Glymph Dep. at 37:21–25. Ms. Glymph identified the reason for her leave as issues with her teeth. *See* Glymph Dep. at 38:14–22. Ms. Glymph had never previously requested leave for this issue. *Id.* at 39:2–7. Ms. Glymph readily admits that she received all the FMLA leave that she requested in relation to her absence beginning on October 15, 2018. *See id.* at 56:21–25 ("Q  And you were given leave on October 15th, correct, of 2018?  A  Correct.  Q  So CompuCom provided you FMLA leave, right?  A  Yes."); 147:10–13 (Q . . . And it's correct, is it not, that when you went out on leave on October 15th, 2018, your FMLA request was approved?  A  Correct."). Indeed, Ms. Glymph admits that there was never *any* point during her employment with CompuCom that she was not approved for leave she requested. *Id.* at 56:18–20; 57:1–9 (Q . . . Is there any point—in your employment that you were not granted leave that you requested?  A  No.  Q  And you did request leave prior to that particular leave, correct?  A  Yes.  Q  Okay.  And you were given—given it?  A.  Yes."). Ms. Glymph also admits that she never suffered any negative consequences for requesting or taking leave. *Id.* at 57:10–13 (Q . . . Did you experience any negative consequences from those times that you requested leave and were given it?  A  No.").

Importantly, Ms. Glymph admits that leave and benefits determinations at CompuCom were not made by CompuCom itself, but instead by a third-party administrator, AbsenceOne. *See* Glymph Dep. at 147:16–149:16; *see also* Holt Decl., Ex. 2 (AbsenceOne leave approval form, Ex. 13 to Glymph Dep.).

COMPUCOM'S MOTION FOR
SUMMARY JUDGMENT
No. 2:21-cv-01704-JHC    - 9 -

HOLT LEGAL, P L L C
705 2nd Avenue, Suite 1200
Seattle, Washington  98104-1798
(206) 372-6261

### 9. Ms. Glymph Applies for Short-Term Disability Benefits and AbsenceOne Initially Denies Her Application

While on leave, Ms. Glymph applied for short-term disability (STD) benefit payments (a regular eXcell benefit) through AbsenceOne, its third-party administrator. Glymph Dep. at 143:2–144:10. Ms. Glymph admits that, although AbsenceOne initially denied her application for STD payments, it later reinstated and paid them after she appealed the denial decision. *Id.* She also admits that she ultimately received benefit payments for the entire time she was on leave. *Id.*; *see also* ECF 10-11 (AbsenceOne reinstatement letter, previously filed with the Court by Ms. Glymph).

### 10. Ms. Glymph Returns from Leave to Her Same Position

Ms. Glymph also admits that, following her FMLA leave, she returned to her same position and resumed work in that position. *See* Glymph Dep. at 53:18–20 ("Q. . . You did return to the same position, did you not?  A  Yes[.]"); 54:1–3 (Q . . . And I believe you just testified that you did return to the job you had, correct?  A  Exactly.").

### 11. Ms. Glymph's Performance Does Not Improve After Her Return to Work

After Ms. Glymph returned to work from leave, her unprofessional behavior became even more unacceptable. Oct. 2019 Ruck Decl., ¶ 26. On one occasion, Ms. Glymph told Mr. Ruck that he had "zero empathy," "could not connect with human beings," and "just viewed people as a bunch of numbers." *Id.* On multiple occasions, Mr. Ruck observed Ms. Glymph literally screaming at AbsenceOne staff over the phone in relation to AbsenceOne's initial determination denying her STD benefits. *Id.* Ms. Glymph also made repeated, verifiably false claims that someone had accessed eXcell's computer systems in order to "hack" her PTO balance. *Id.* She continued to make these claims even after it was repeatedly explained to her that she was simply looking at her PTO balance incorrectly. *Id.* Indeed, she continues to make this claim to this day, with no evidence to support it. *See generally* Glymph Dep. at 41:22–45:25.

COMPUCOM'S MOTION FOR SUMMARY JUDGMENT
No. 2:21-cv-01704-JHC   - 10 -

HOLT LEGAL, P L L C
705 2nd Avenue, Suite 1200
Seattle, Washington 98104-1798
(206) 372-6261

### 8. CompuCom Discharges Ms. Glymph When Her Performance and Attendance Do Not Improve

At this point, based on Ms. Glymph's failure to improve her performance over many months despite repeated, specific counseling, as well as based on Ms. Glymph's increasingly inappropriate conduct, general hostility, and outbursts, Mr. Ruck made the decision to terminate Ms. Glymph's employment. *Id.* ¶ 27. Together with excel Human Resources Director Maddie Constantinidis, who attended by phone, Mr. Ruck met with Ms. Glymph on November 26, 2018, and informed her that her employment with eXcell was terminated, effective immediately. *Id.* Ms. Glymph's discharge was memorialized in a letter to her from Ms. Constantinidis dated November 30, 2018. *Id.*; *see also* Nov. 2024 Ruck Decl., ¶ 9, Ex. 8 (termination letter).

Strangely—but not materially to this case—Ms. Glymph denies receiving her termination notice. Glymph Dep. at 162:21–164:7 ("I don't think I received it."). Objective proof shows that it was delivered to her residence. Ex. 3 to Holt Decl.

### B. Procedural Background and History of the Case

Following Ms. Glymph's discharge, on August 14, 2019, Ms. Glymph filed a charge of discrimination with U.S. EEOC, alleging discrimination on the basis of disability. Ex. 4 to Holt Decl. On November 1, 2019, CompuCom filed a statement of its position, responding to Ms. Glymph's charge. Ex. 5 to Holt Decl.[2] On February 10, 2020, EEOC issued a "no cause" determination and notice of right to sue, and dismissed the charge. Ex. 6 to Holt Decl.

On November 19, 2021, just short of three years after her discharge, Ms. Glymph filed a bare-bones complaint against CompuCom and its registered agent in state court, alleging claims for "wrongful termination," "disability discrimination," "FMLA violation," and "Employer Retaliation." ECF 1-2. CompuCom then timely removed the case to this Court. ECF 1.

After removal, on January 5, 2022, CompuCom moved to dismiss Ms. Glymph's complaint under Federal Rule of Civil Procedure 12(b)(6). ECF 6. On June 10, 2022, the Court dismissed

---

[2] Due to their volume, the exhibits to CompuCom's position statement are omitted.

COMPUCOM'S MOTION FOR SUMMARY JUDGMENT
No. 2:21-cv-01704-JHC    - 11 -

HOLT LEGAL, P L L C
705 2nd Avenue, Suite 1200
Seattle, Washington 98104-1798
(206) 372-6261

1  Ms. Glymph's ADA claims with prejudice as time-barred, but without prejudice as to her FMLA
2  claims. ECF 19. Ms. Glymph filed an amended complaint on June 15, 2022. ECF 22. CompuCom
3  renewed its motion to dismiss the amended complaint on July 27, 2022. ECF 23. On August 19,
4  2022, the Court granted CompuCom's renewed motion, finding that Ms. Glymph's Amended
5  Complaint "fails to allege any causal connection between her exercise of her rights under the Family
6  and Medical Leave Act (FMLA) and her discharge from Defendant."  ECF 24 at 1:21–23.
7  Accordingly, the Court held that Ms. Glymph "failed to bring this lawsuit within the applicable
8  statute of limitations, and the suit is therefore untimely." *Id.* at 1:25–2:2.

9  Ms. Glymph then appealed to the Ninth Circuit Court of Appeals. ECF 25. The Ninth
10 Circuit reversed, holding that by virtue of pleading mere temporal proximity between FMLA-
11 protected leave and CompuCom terminating her employment, Ms. Glymph's amended complaint
12 sufficiently alleged (for a pro se party) "that her leave was causally connected to her termination
13 and that defendant's termination of Glymph was willful." ECF 29 at 2.

14 Next, CompuCom attempted to take Ms. Glymph's deposition, but she refused to attend, so
15 the Court ordered her to do so. *See generally* ECF 71–77. After the Court's order, Ms. Glymph
16 still refused—deliberately not appearing as directed, and instead going to an unscheduled urgent
17 care appointment. *See generally* ECF 78 (motion for sanctions). At that point, the Court directed
18 Ms. Glymph to appear for her deposition or it would issue dismissal sanctions. *See* ECF 88.

19 CompuCom finally took Ms. Glymph's deposition on November 7, 2024.[3]

---

[3] Whether Ms. Glymph legitimately complied with the Court's order is questionable. Although (because?) the deposition was noticed as a videotaped deposition, Ms. Glymph insisted on wearing large, mirrored sunglasses throughout the proceeding, along with a mask covering the bottom half of her face. Holt Decl., ¶ 2; *see also* Glymph Dep., at 6:8–7:5. Ms. Glymph insisted that this was due to a health condition. *See id.* Ms. Glymph was unable to explain any medical basis for her hiding her face and would not commit that a physician had told her that using a plain cloth mask would be medically helpful. Holt Decl., ¶ 2. Nonetheless, CompuCom elected to proceed. *Id.*

COMPUCOM'S MOTION FOR
SUMMARY JUDGMENT
No. 2:21-cv-01704-JHC         - 12 -

HOLT LEGAL, P L L C
705 2nd Avenue, Suite 1200
Seattle, Washington 98104-1798
(206) 372-6261

### C. Ms. Glymph's Deposition Testimony

During Ms. Glymph's deposition, she agreed that her FMLA claims *solely* relate to events between "10/15/2018 to 11/15/2018," and not to any leave, conduct, or events predating her approved FMLA leave beginning on October 15, 2018. Glymph Dep. at 202:8–203:22. This testimony is consistent with Ms. Glymph's discovery responses. *See id.*; *see also* Holt Decl., Ex. 7 (Plaintiff's discovery responses, Ex. 17 to Plaintiff's deposition).

When asked upon what evidence she bases her claim that CompuCom willfully violated the FMLA, Ms. Glymph's response was limited to three allegations: (a) that CompuCom terminated her employment 10 days after her return from FMLA leave; (b) that CompuCom "stripped" her earned paid time off (PTO) hours; and (c) that CompuCom initially denied (but later approved) her request for short term disability leave benefits for the period she was on FMLA leave. Glymph Dep. at 36:17–37:8. Despite repeated inquiries, Ms. Glymph was unable to identify any other factual bases for her remaining claim. *Id.* at 37:9–20 (*e.g.*, "That's all I can think of at the moment.").

Addressing first Ms. Glymph's discharge, she explicitly admitted when deposed that her *sole* factual basis for claiming her termination violated the FMLA is the mere fact that it occurred after she took protected leave. In Ms. Glymph's own words:

> Q   Okay. Why do you believe CompuCom terminated your employment?
>
> A   *I have no idea*.
>
> . . . .
>
> Q   In what way do you believe the fact that you were terminated interfered with your FMLA rights?
>
> A   Because I was supposed to return back to the same position that I had before I went on FMLA.
>
> Q . . . You did return to the same position, did you not?
>
> A   Yes, but I wasn't supposed to be terminated either.
>
> Q . . . And then what is the basis for you stating "I wasn't supposed to be terminated either"?

COMPUCOM'S MOTION FOR SUMMARY JUDGMENT
No. 2:21-cv-01704-JHC   - 13 -

HOLT LEGAL, P L L C
705 2nd Avenue, Suite 1200
Seattle, Washington  98104-1798
(206) 372-6261

> A  I wasn't.  I was supposed to return to the job that I had.
>
> Q  Okay.  And I believe you just testified that you did return to the job that you had, correct?
>
> A  Exactly.
>
> Q  Okay.  And so in what way was the termination decision unlawful?
>
> A  Yes.
>
> Q  In what way was it?
>
> A  It was just unlawful.  *I don't know why they did what they did.*
>
> Q  Okay.  So you don't have any knowledge about that?
>
> A  *No, I don't.*

Glymph Dep. at 53:8–54:12 (emphasis added).  If this is not clear enough, Ms. Glymph again expressly affirms that the *only* basis she has to believe that Mr. Ruck retaliated against her (because she took protected leave) was the mere fact that she was discharged, and nothing else.  *See* Glymph Dep. at 61:16–62:22 (*e.g.*, "Q   So—so there's nothing he said, there's nothing he did, there's just what you're describing as the results, the fact that you were terminated?  A   Yes.").

Ms. Glymph also admits that she has no idea who else might have retaliated against her and can think of no reason why they would do so, other than that these unknown actors have "ugly hearts."  *See* Glymph Dep. at 62:23–66:3 (*e.g.*, "Q . . . And why do you think that the—the individuals who you have never met and—and can't name had ugly hearts and wanted to cause you harm?  A  I have no idea.  I don't even know the people.").

Ms. Glymph's testimony also unambiguously establishes that she cannot identify any facts and cannot present any evidence supporting her claim that someone at CompuCom altered her PTO balance; Ms. Glymph's only basis for this claim is her unsupported personal conviction that she had fewer PTO hours than she believed she should have had.  *See* Glymph Dep. at 42:3–45:25 (*e.g.*, Q. . . So other than the [PTO] record in Workday being different than you thought it was, as you sit here, can you identify anything else?  A  Huh-uh.  No.").

COMPUCOM'S MOTION FOR SUMMARY JUDGMENT
No. 2:21-cv-01704-JHC    - 14 -

HOLT LEGAL, P L L C
705 2nd Avenue, Suite 1200
Seattle, Washington  98104-1798
(206) 372-6261

Finally, Ms. Glymph admits that the sole basis for her belief that AbsenceOne denying her short-term disability payments violated the FMLA is (circularly) her conviction that she was eligible for those benefits, but was initially denied them before receiving them. *See* Glymph Dep. at 39:14–41:1 (*e.g.*, "Q  Are you able to explain beyond saying it was a benefit that I was entitled to, why you think not receiving short-term disability payments violated the federal Family and Medical Leave Act?  A  That's—that's all I have for you, that answer I gave you."). Ms. Glymph also admits that she does not even know who made the decision to deny her short-term disability benefits. *See* Glymph Dep. at 150:5–153:23 (*e.g.*, "Q  So—so the only reason, as I understand your testimony, that you are claiming it was retaliation for taking FMLA is mere—merely the fact that it was denied. Do I understand that correctly?  A  My disability, my short-term disability was denied.  Q  I understand that.  A  Yes.").

### III.  AUTHORITY

#### A.  Summary Judgment Standard

Summary judgment is warranted if no material issue of fact exists for trial. *Crawford v. JP Morgan Chase NA*, 983 F. Supp. 2d 1264, 1268 (W.D. Wash. 2013) (citing *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995)). The underlying facts are viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The moving party has the initial burden to show the absence of a genuine issue of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). If the moving party does so, the burden shifts to the nonmoving party to establish that a genuine issue of fact exists for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). At this point, the nonmoving party cannot rely on its pleadings, but instead must present actual evidence showing that a genuine issue exists. *Id.* at 324, 106 S. Ct. 2548. A party cannot create a material factual issue for trial by submitting an affidavit that contradicts prior deposition testimony. *Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266–67 (9th Cir. 1991).

COMPUCOM'S MOTION FOR
SUMMARY JUDGMENT
No. 2:21-cv-01704-JHC        - 15 -

HOLT LEGAL, P L L C
705 2nd Avenue, Suite 1200
Seattle, Washington  98104-1798
(206) 372-6261

B. **Legal Standard Required to Establish a "Willful" FMLA Violation**

When a claim alleging interference with FMLA rights is filed more than two years and less than three years after the events in question, for the claim to be timely, the plaintiff must be able to show that the employer's alleged FMLA violations were "willful." 29 U.S.C. § 2617(c)(2). This means that the "plaintiff must show that her employer either knew or showed reckless disregard for whether its conduct violated the Act." *Olson v. U.S. ex rel. Dep't of Energy*, 980 F.3d 1334, 1339 (9th Cir. 2020). "The elements of a FMLA interference claim are (1) an entitlement to FMLA leave; (2) an adverse action by Plaintiff's employer, which interfered with Plaintiff's right to take FMLA leave; and (3) a showing that the employer's adverse action was related to the exercise, or attempt to exercise, FMLA rights." *Martinez Patterson v. AT&T Servs. Inc.*, No. C18-1180-RSM, 2021 WL 3617179, at *11 (W.D. Wash. Aug. 16, 2021), *aff'd*, No. 21-35766, 2022 WL 2304218 (9th Cir. June 27, 2022).

C. **No Genuine Issue of Material Fact Exists for Trial as to Whether CompuCom Willfully Violated Ms. Glymph's Rights Under the FMLA**

In this case, for purposes of summary judgment, CompuCom does not dispute that Ms. Glymph was eligible for and took FMLA-protected leave from October 15, 2018, to November 15, 2018. CompuCom granted the leave, and then approved it as FMLA-covered leave. Likewise, CompuCom does not dispute that it terminated Ms. Glymph's employment at the end of November 2018, and that this was an adverse employment action. However, CompuCom absolutely disputes—and no evidence of any kind whatsoever exists supporting—the claim that Ms. Glymph's discharge had anything to do with her taking protected leave. To the contrary, Ms. Glymph had a well-documented history of objectively serious performance and attendance issues that *long* predated her taking FMLA-protected leave on October 15, 2018. Based on this established history and Ms. Glymph's own express admissions, no genuine factual issue exists for trial on Ms. Glymph's current claim that she was discharged for taking FMLA leave. Accordingly, the Court should grant summary judgment in CompuCom's favor.

COMPUCOM'S MOTION FOR
SUMMARY JUDGMENT
No. 2:21-cv-01704-JHC          - 16 -

HOLT LEGAL, P L L C
705 2nd Avenue, Suite 1200
Seattle, Washington 98104-1798
(206) 372-6261

### 1. No Evidence Exists that CompuCom Terminated Ms. Glymph's Employment Because She Took FMLA Leave After Receiving an Updated PIP

Ms. Glymph is unable to provide any evidence whatsoever substantiating the most serious of her allegations: that she was terminated because she took FMLA-protected leave beginning on October 15, 2018. This is because no evidence exists. Rather, CompuCom fired Ms. Glymph for a long history of major performance and attendance deficiencies followed by a formal PIP, an extension of the PIP, and the utter failure by Ms. Glymph even to acknowledge her performance problems, let alone correct them. Indeed, Ms. Glymph herself admits that she has no factual basis for, or evidence supporting, her claim to have been terminated for taking protected leave—other than the purely circular argument that she took protected leave, and her employment was terminated afterward. This is not evidence. Although Ms. Glymph claims to believe that some causal link exists between her leave and her termination, she cannot explain what this supposed link is, or produce any evidence substantiating it. This is insufficient to overcome summary judgment. *See Matsushita*, 475 U.S. at 586 (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"); *see also* Fed. R. Civ. P. 56(e).

No evidence exists supporting a "willful" violation of the FMLA by CompuCom, and summary judgment in CompuCom's favor is warranted.

### 2. No Evidence Exists that Anyone Altered Ms. Glymph's PTO Balance, Let Alone Did So to Retaliate Against Her for Taking FMLA Leave

Similarly, Ms. Glymph's own testimony establishes that she has no basis to claim that the supposed alteration of her PTO occurred to retaliate against her for taking FMLA leave, or to interfere with her rights under the FMLA. Indeed, Ms. Glymph is unable even to explain why she claims her PTO was "altered" other than to assert, without evidence, that her PTO balance at the time, as reflected in Workday, was different than she recalled. She freely admits that she hasn't the faintest idea how this supposed alteration occurred, who did it, or why. This wholly unsupported speculation cannot create a material factual issue for trial.

COMPUCOM'S MOTION FOR
SUMMARY JUDGMENT
No. 2:21-cv-01704-JHC                - 17 -

HOLT LEGAL, P L L C
705 2nd Avenue, Suite 1200
Seattle, Washington  98104-1798
(206) 372-6261

### 3. AbsenceOne's Initial Denial and Later Reinstatement of Ms. Glymph's Short-Term Disability Payments Provides No Basis for Ms. Glymph's FMLA Claim

Finally, Ms. Glymph's own testimony establishes that she has no evidence supporting the only other alleged basis for her lawsuit, the initial denial of her short-term disability benefits application by CompuCom's third-party benefits administrator, AbsenceOne. Once again, Ms. Glymph admits that she has no idea why her benefits were denied, who denied them, or why. Fairly obviously, this was not even a decision that CompuCom itself directly made. And no evidence supports the notion that it was made (by the currently unknown decisionmaker) to punish Ms. Glymph for taking leave. Coupled with the fact that Ms. Glymph readily admits that she previously took leave with no adverse consequences of any kind, this establishes that summary judgment on Ms. Glymph's claim under this theory is warranted as well.

### IV. CONCLUSION

CompuCom requests that the Court enter an order of summary judgment dismissing Plaintiff Laffon Glymph's remaining claims, and this case, with prejudice.

DATED: December 2, 2024

*s/ Thomas P. Holt*
Thomas P. Holt, WSBA #39722
HOLT LEGAL, PLLC
705 2nd Avenue, Suite 1200
Seattle, Washington 98104-1798
Phone: (206) 372-6261
Email: tom@holt-legal.com

Attorneys for Defendant COMPUCOM SYSTEMS, INC.

I certify that this memorandum contains 6,214 words, in compliance with the Local Civil Rules.

COMPUCOM'S MOTION FOR SUMMARY JUDGMENT
No. 2:21-cv-01704-JHC          - 18 -

HOLT LEGAL, P L L C
705 2nd Avenue, Suite 1200
Seattle, Washington 98104-1798
(206) 372-6261