UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LAFFON GLYMPH, | CASE NO. 2:21-cv-01704-JHC |
| Plaintiff, | ORDER GRANTING MOTION FOR SUMMARY JUDGMENT |
| v. | |
| CT CORPORATION SYSTEMS, and COMPUCOM SYSTEMS, INC., | |
| Defendants. | |

# I

## INTRODUCTION

This matter comes before the Court on Defendant CompuCom Systems. Inc.'s Motion for Summary Judgment. Dkt. # 95. CompuCom employed pro se Plaintiff Laffon Glymph. Glymph took a one-month leave in 2018 under the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 and Washington Family Leave Act (WFLA), RCW § 49.78.[1] *See* Dkts. # 96 at 46–47; # 97 at 53–54. After she returned, CompuCom terminated Plaintiff's employment.

---

[1]The Court notes that since Glymph went on leave in 2018 the Washington Family Leave Act has been repealed and replaced with the Washington Paid Family Medical Leave Act, RCW § 50A.40, *et seq.*

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT - 1

Plaintiff sued, claiming that the company violated the FMLA. Dkt. # 62. For the reasons below, the Court GRANTS CompuCom's motion for summary judgment.[2]

## II

### BACKGROUND

On March 1, 2017, Glymph began working at eXcell, a division of CompuCom, as a Payroll Analyst. Dkt. # 96 at 6 ¶ 2. eXcell "plac[es] employees with other businesses and handl[es] payroll for those employees." *Id.* at 7 ¶ 9. Many of Glymph's duties were time sensitive; for example, she completed daily payroll onboarding for new employees. *Id.* This task had to be performed on time to allow new employees to "record their hours worked on the jobs at which they are placed." *Id.*

After a few months at eXcell, Glymph's performance began to decline. *Id.* at 6 ¶¶ 3–6. Her work schedule required her to be in office daily at 9:30 a.m. but she would regularly show up at 10:30 a.m. or later and would also leave early. *Id.* at 7 ¶ 11, 13–15. Managers from different companies complained to Brady Ruck, Glymph's direct supervisor, that new employees could not input their work hours because Glymph had not completed the new employee onboarding. *Id.* at 6–7 ¶ 1, 9. Glymph's tardiness also created "significant problems for eXcell's corporate payroll team." *Id.* at 7 ¶ 12. The corporate payroll team runs payroll every two weeks, and part of Glymph's job as an analyst was to field questions from the team. *Id.* Because

---

[2] On January 15, 2025, Glymph filed a document titled "Plaintiff's Response to Defendant's Motion for Summary Judgment." Dkt. # 104. This document appears to supplement her response to CompuCom's motion for summary judgment that she filed with the Court in December 2024. Dkt. # 98. On January 21, 2025, CompuCom filed a surreply, including a request to strike Glymph's supplemental document. Under Local Rule 7(m), "[p]arties are expected to file accurate, complete documents, and the failure to do so may result in the court's refusal to consider later filed corrections or additions to the record." Because Glymph did not file a praecipe requesting that this document be considered with her opposition papers nor explained why the information in the document was not included with the original filing, the Court does not consider this supplemental document. Accordingly, the Court need not rule on CompuCom's request to strike.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT - 2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Glymph "failed to arrive at work as scheduled by 9:30 a.m., and . . . rarely arrived at work before the 10:00 a.m. Wednesday deadline to submit payroll to the bank," she was generally unavailable to answer questions or provide timely answers to questions. *Id.* at 8 ¶ 13. The payroll team "often had to make assumptions about work she had performed." *Id.* at 8 ¶ 13. This sometimes resulted in contractors being paid incorrectly. *Id.*

Ruck counseled Glymph repeatedly about her attendance issues and the need for her to be, at a minimum, available on Wednesday mornings to answer the payroll team's questions. *Id.* at 8 ¶ 14. But Glymph's attendance and general work performance did not improve. *Id.* At the end of 2017, Ruck met with Glymph to discuss her annual performance review. *Id.* at 6 ¶ 5. They discussed her declining work performance and Glymph attributed her performance issues to a parasitic infection in her neck that she said she contracted by drinking tap water in Kansas. *Id.* at 6 ¶ 6. Later, when Ruck proposed that eXcell conduct an ergonomic assessment to help her "safely and comfortably perform work," Glymph stated that her neck was now fine. *Id.* at 6 ¶ 7. Glymph did not follow up with Ruck on issues with her neck. *Id.*

On July 30, 2018, Ruck placed Glymph on a performance improvement plan (PIP) to last from July 30, 2018, to August 30, 2018. *Id.* at 8 ¶ 15, 17–26. The PIP detailed Glymph's performance and attendance issues and laid out specific improvements that Ruck expected Glymph to make, including arriving to work on time. *Id.* at 8 ¶ 15; 17–21. When Ruck met with Glymph to deliver the PIP, she informed him that she could not meet the expectations laid out in the PIP because she was taking care of her aunt who had been stabbed in the leg. *Id.* She did not inform Ruck when the stabbing occurred or when her aunt would be sufficiently recovered to allow Glymph to come into work on time. *Id.* The day after Ruck delivered the PIP to Glymph, she emailed Ruck saying that her work performance was affected by an "unexpected health matter that arose at the end of 2017." *Id.* at 8 ¶ 17. Due to scheduling issues, they did not meet

until September 17, 2018, to discuss the PIP. *Id.* at 9 ¶¶ 20–21. Glymph did not commit to improving her work performance and she accused other eXcell employees of accessing the payroll software "to undo . . . her timely work in setting up contractor payroll onboarding." *Id.* at 9 ¶ 21. Glymph refused to sign the updated PIP and asserted that her performance issues were because of a "critical health condition." *Id.* at 9 ¶ 22, 27–37. After her meeting with Ruck, Glymph did not abide by the PIP and would routinely come into the office after 10:00 a.m. *Id.* at 10, 19 ¶ 24. Glymph also became "hostile and confrontational" with Ruck and other eXcell employees, and "lashed out" when other members of her department asked about the status of her projects. *Id.* at 10 ¶ 24.

On October 15, 2018, Glymph went on a month-long FMLA and WFLA leave for dental issues. Dkt. # 97 at 16–17, 53. AbsenceOne, CompuCom's third-party benefits administrator at first approved and then later denied Glymph's request for short-term disability benefits. *Id.* at 36–39, 53–54. After Glymph appealed AbsenceOne's denial, she was again approved for short-term disability benefits. *Id.* When Glymph returned to work from leave, she accused Ruck of having "zero empathy" and viewing "people as a bunch of numbers." Dkt. # 96 at 10 ¶ 26. Ruck observed Glymph several times "screaming at [the] third-party administrator over the phone while she was at work." *Id.* at 10 ¶ 26. Glymph also asserted that someone had accessed the company's computer system to alter her paid time off (PTO) balance. *Id.* On November 26, 2018, CompuCom terminated Glymph's employment. *Id.* at 11 ¶ 28, 46–47.

CompuCom moves for summary judgment seeking dismissal of Glymph's claims. Dkt. # 95 at 18. It argues that no evidence shows that it willfully violated Glymph's rights under the FMLA. *Id.* at 16. It also says that no genuine issue of material facts exists for Glymph's state-

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT - 4

law claims, which are "wholly derivative of and identical to" Glymph's claims under the FMLA. Dkt. # 102 at 12.[3]

### III

### DISCUSSION

Summary judgment is warranted if the evidence, viewed in the light most favorable to the non-moving party, shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party." *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248–49).

The moving party bears the initial burden of showing there is no genuine dispute of material fact and that it is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. To carry its burden "the moving party must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). If the moving party meets its burden of production, the burden shifts to the nonmoving party to identify specific facts from which a factfinder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at

---

[3] In her Opposition to CompuCom's Motion for Summary for Summary Judgment, Glymph claims "Retaliation Under the Washington Law Against Discrimination." *See* Dkt. # 98 at 31. But her Second Amended Complaint does not include this claim. *See generally* Dkt. # 62. While the Court liberally construes pro se pleadings, the Court will not consider new allegations asserted for the first time at summary judgment. *See, e.g.*, *Burrell v. Cnty. of Santa Clara*, No. 11–CV–04569–LHK, 2013 WL 2156374, at *11 (N.D. Cal. May 17, 2013) ("The [c]ourt will not consider claims raised for the first time at summary judgment which [the] [p]laintiffs did not raise in their pleadings.").

324; *Anderson*, 477 U.S. at 250; *see also Gov't Emps. Ins. Co. v. Nadkarni*, 477 F. Supp. 3d 1091, 1096 (N.D. Cal. 2020), *aff'd*, 842 F. App'x 172 (9th Cir. 2021) ("The non-moving party may not rest upon mere allegations or denials of the adverse party's evidence, but instead must produce admissible evidence that shows there is a genuine issue of material fact for trial."). "The summary judgment rules apply with equal force to *pro se* litigants because they 'must follow the same rules of procedure that govern other litigants.'" *Schwartz v. World Sav. Bank*, No. C11-0631JLR, 2012 WL 993295, at *3 (W.D. Wash. Mar. 23, 2012) (quoting *King v. Atiyeh,* 814 F.2d 565, 567 (9th Cir.1995)).

A.     FMLA

The FMLA provides leave entitlements for employees who need to take absences from work for, among other things, serious medical conditions. 29 U.S.C. § 2612. It makes it "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under" the statute. 29 U.S.C. § 2615 (a)(1). Generally, FMLA claims must be brought within two years of "the date of the last event constituting the alleged violation for which the action is brought." 29 U.S.C. § 2617(c)(1). But that period extends to three years if the defendant-employer's actions were "willful." 29 U.S.C. § 2617(c)(2). In order "to benefit from the FMLA's three-year statute of limitations, a plaintiff must show that [their] employer either knew or showed reckless disregard for whether its conduct violated the Act." *Olson v. United States by & through Dep't of Energy*, 980 F.3d 1334, 1339 (9th Cir. 2020). Because Glymph filed the complaint on November 18, 2021, just under three years after CompuCom terminated her employment on November 26, 2018, she must show a willful violation of the FMLA to survive the statute of limitations bar. *See* Dkt. # 1-2; *see also Martinez Patterson v. AT&T Servs. Inc.*, No. C18-1180-RSM, 2021 WL 3617179, at *11 (W.D. Wash. 2021).

"The elements of an interference claim are (1) an entitlement to FMLA leave; (2) an adverse action by [the] [p]laintiff's employer, which interfered with [the] [p]laintiff's right to take FMLA leave; and (3) a showing that the employer's adverse action was related to the exercise, or attempt to exercise, FMLA rights." *Wilmuth v. Amazon.com Inc.*, No. 2:23-CV-01774-JNW, 2024 WL 5088337, at *7 (W.D. Wash. Dec. 12, 2024) (quoting *Martinez Patterson*, 2021 WL 3617179, at *11). "The Ninth Circuit requires an employee to prove this claim by using either direct or circumstantial evidence, or both." *West v. Alaska Airlines, Inc.*, No. 3:18-CV-00102-JMK, 2020 WL 8175608, at *5 (D. Alaska Nov. 19, 2020) (citing *Sanders v. City of Newport*, 657 F.3d 772, 777–78 (9th Cir. 2011)).

To establish a claim for retaliation under the FMLA, a plaintiff must show "(1) [they] availed [themselves] of a protected right under the FMLA; (2) [they] [were] adversely affected by an employment decision; and (3) there is a causal connection between the two actions." *West*, 2020 WL 8175608, at *5.

Glymph contends that CompuCom violated her rights under the FMLA in three ways: (1) by terminating her employment in retaliation for her taking FMLA leave; (2) by altering her PTO benefits "to a negative balance" to interfere with her FMLA leave and to retaliate against her for taking FMLA leave; and (3) by initially denying her request for short-term disability benefits. Dkt. # 98 at 33–36. For the reasons below, the Court concludes that Glymph has failed to raise a material dispute of fact as to any of her claims under the FMLA.

1.    Termination

CompuCom does not dispute that Glymph was entitled to and took FMLA-protected leave from October 15, 2018, to November 15, 2018. Dkt. # 95 at 16. The company also acknowledges that its termination of Glymph's employment was an adverse employment action. *Id.* CompuCom does dispute that Glymph's "discharge had anything to do with her taking

protected leave." *Id.* It contends that Glymph cannot provide any evidence that she was discharged because she took FMLA leave. *Id.* at 17. It says that it terminated her employment because of "a long history of major performance and attendance deficiencies followed by a formal PIP, an extension of the PIP, and the utter failure by . . . Glymph even to acknowledge her performance problems, let alone correct them." *Id.* CompuCom states that although Glymph asserts that "some causal link exists between her leave and her termination, she cannot explain what this supposed link is, or produce any evidence substantiating it." *Id.*

Glymph responds that CompuCom terminated her employment 10 days after she returned to work from FMLA leave. Dkt. # 98 at 34. She contends that this temporal proximity establishes causation. *Id.* at 32–33 (citing *Villiarimo v. Aloha Island Air, Inc.* 281 F.3d 1054, 1065 (9th Cir. 2002)). She asserts that she only needs to show that her leave was a "negative factor" in CompuCom's decision to terminate her employment. *Id.* at 32 (citing *Bachelder v. Am. W. Airlines*, *Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001)). Glymph says that "[t]he evidence already developed here makes clear that [her] FMLA leave was a negative factor in the decision to terminate her." *Id.*[4]

The question here at the summary judgment stage is whether there is a triable issue of material fact as to whether CompuCom impermissibly considered Glymph's taking of FMLA leave as a factor in her termination. *See Xin Liu v. Amway Corp.*, 347 F.3d 1125, 1136 (9th Cir.

---

[4] Glymph also asserts that the "Ninth Circuit found [that her] allegations establish a causal connection between [her] leave and termination. Dkt. # 98. But the Ninth Circuit's decision reversing the dismissal of Glymph's FMLA claim was based on Glymph's *allegations* in the operative complaint and decided under the Federal Rule of Civil Procedure 12(b)(6) standard. *See* Dkt. # 29 at 2 ("Liberally construed, Glymph's allegations establish that her leave was causally connected to her termination and that defendant's termination of Glymph was willful."). At the summary judgment phase, the Court must determine whether there is a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a); *see also Pa. Higher Educ., Assistance Agency v. Miss. Higher Educ. Assistance Corp.*, No. 1:11-CV-1320, 2012 WL 13005480, at *10 (M.D. Pa. June 6, 2012) ("The 'no genuine issue of material fact' standard at summary judgment is much more demanding than the 'plausibility' standard at the motion to dismiss stage.") (internal citation omitted).

2003). An employee can establish that their employer interfered with their rights under the FMLA by terminating their employment by showing "by a preponderance of the evidence that [their] taking of FMLA-protected leave constituted a negative factor in the decision to terminate [them]. [They] can prove this claim, as one might any ordinary statutory claim, by using either direct or circumstantial evidence, or both." *Id.* (quoting *Bachelder*, 259 F.3d at 1125). "While proximity in time may be circumstantial evidence that the employer used an employee's leave request as a negative factor, proximity must be considered in factual context." *Martinez Patterson*, 2021 WL 3617179, at *12 (granting the employer's summary judgment motion as to the plaintiff's FMLA retaliation claim because the factual circumstances surrounding the temporal proximity between the plaintiff's request for FMLA leave and her termination showed that the decision to fire her was based on the employee's low rating stemming from employment evaluations that had been submitted before her requesting FMLA leave) (internal quotation omitted).

Glymph does not provide evidence showing that a material issue of fact exists as to whether CompuCom impermissibly considered her taking FMLA leave in its decision to terminate her employment. Her opposition brief includes unsworn allegations that the Court cannot credit at summary judgment. *See Bethune v. City of Washougal*, 642 F. Supp. 3d 1246, 1258 (W.D. Wash. 2022) ("At summary judgment a court may not accept unsupported allegations in a party's briefing as valid evidence."). While "in some cases [ ] causation can be inferred from timing alone," *Aloha Island Air, Inc.*, 281 F.3d at 1065, "[a]n employer does not violate the FMLA by terminating an employee for performance problems so long as the FMLA leave was not also a negative factor in the decision." *Douglas v. Dreamdealers USA, LLC*, 416 F. Supp. 3d 1063, 1071 (D. Nev. 2019) (citing *Liston v. Nev. ex rel. its Dep't of Bus. & Indus.*, 311 Fed. App'x. 1000, 1002 (9th Cir. 2009)). CompuCom has put forth creditable evidence that

Glymph's termination was based on performance issues that began before she went on FMLA leave and continued to persist after she returned to work; these issues, including ones outlined in the PIP, include (1) Glymph's tardiness, especially during important reporting periods for payroll, (2) her failure to finalize new employee payroll processing documents on time, and (3) her general hostility towards her supervisor and coworkers.[5]  *See* Dkt. # 96 at 10, 19, 23, 42–44; *see also Swan v. Bank of Am.*, 360 F. App'x 903, 906 (9th Cir. 2009) ("[A]n employer is not required to cease pursuing a disciplinary course of action against an employee that began before that employee took FMLA-related leave, simply because that employee took leave.").

Viewing the evidence presented in the light most favorable to Glymph, no reasonable factfinder could find that her taking of FMLA leave constituted a negative factor in the decision to terminate her employment.  *See Martinez Patterson*, 2021 WL 3617179, at *12.

2.      Alteration of Glymph's PTO Balance

CompuCom contends that no evidence shows that anyone altered Glymph's PTO balance or that any one did so to retaliate against her for taking FMLA leave.  Dkt. # 95 at 17.  It argues that Glymph's testimony during her deposition reveals that "she has no basis to claim that the supposed alteration of her PTO occurred to retaliate against her for taking FMLA leave, or to interfere with her rights under the FMLA."  *Id*.  The company also says that Glymph cannot explain her belief that her PTO was altered other than to say, without evidence, that her PTO in Workday was different from what she remembered.  *Id*.  CompuCom contends that Glymph's "wholly unsupported speculation cannot create a material factual issue for trial."  *Id*.

---

[5] Glymph cursorily asserts that CompuCom is "falsifying documents," including a "false keycard excel spreadsheet," and says she cannot "authenticate the authenticity of her deposition transcripts" and that the "negative comments made by the defense counsel are false." Dkt. # 98 at 39–40. These arguments are underdeveloped and unsupported by the record.

Glymph responds that while she was on FMLA leave CompuCom "willfully started to retaliate against [her] on October 15, 2018 by altering PTO to a negative balance." Dkt. # 98 at 34. She similarly asserts that her "PTO [b]enefits were altered to a negative balance" to support her FMLA interference claim. *Id.* at 33.

The Court agrees with CompuCom. Glymph provides no evidence, other than unsupported allegations, that CompuCom ever altered her PTO, much less that it was altered to retaliate against her or unlawfully interfere with her taking FMLA leave. Courts have "refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony." *Aloha Island Air, Inc.*, 281 F.3d at 1061 (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996)). In his declaration, Ruck states that after Glymph claimed her PTO balance had been "hacked" that "it was explained to her that she was simply looking at her PTO balance incorrectly." Dkt. # 96 at 10–11 ¶ 26. During Glymph's deposition, she asserted that someone at CompuCom altered her PTO balance in Workday while she was on FMLA leave from a positive to a negative amount. Dkt. # 97 at 22–23. But Glymph provides no evidence to support her testimony. *See Wigfall v. Shea*, —F. Supp. 3d —, No. CV 00-12274-DPW, 2024 WL 3760819, at *5 (D. Mass. Aug. 12, 2024) (reasoning that a court "cannot put flesh on the bare bones of an underdeveloped argument") (internal citation omitted).

### 3.    Denial of Short-Term Disability Benefits

CompuCom asserts that AbsenceOne's initial denial and later reinstatement of Glymph's short-term disability benefits does not provide a basis for her FMLA claim. Dkt. # 95 at 18. The company argues that Glymph's testimony shows that "she has no idea why her benefits were denied, who denied them, or why" they denied them, and no evidence shows that some "unknown decisionmaker" made the decision to punish Glymph for taking FMLA leave. *Id.* It

also says that the decision to deny and reinstate Glymph's benefits was not a decision "directly made" by CompuCom. *Id.*

Glymph says that CompuCom's denial of her short-term disability benefits "was adverse treatment to [her] serious health condition." Dkt. # 98 at 35. She also says that CompuCom "initially approved short-term disability [*sic*] . . . and then turned around and denied [her] short-term disability [*sic*] with discriminatory comments such as 44 year old female off of work on 10/15/18 due to tooth pain with teeth extraction. Although you had [*sic*] complaints of pain, pain alone is not disabling." *Id.*

Glymph does not provide any evidence showing that a material issue of fact exists as to whether the denial and later reinstatement of her short-term disability benefits by a third-party benefits administrator is casually linked to a violation of the FMLA. *See Offley v. Activision, Inc.*, 273 F. App'x 610, 611 (9th Cir. 2008) ("Having failed to cite to the record, plaintiffs have not pointed to any factual dispute that requires trial and precludes summary judgment."). Moreover, during her deposition, Glymph testified that CompuCom provided her with FMLA leave on October 15, 2018, and she received her short-term disability payments in 2019. Dkt. # 97 at 28–29, 37. Glymph also said that she believed the denial of short-term disability benefits was retaliatory because "money [was] take[n] out of [her] check every pay period" for disability benefits, and she was denied the disability benefits when she needed it. *Id.* at 43. Glymph stated that the explanation about the denial of benefits "ma[de] no sense" to her. *Id.* As noted by CompuCom, Glymph identifies no evidence to support her assertion that the denial (later reversed) of disability benefits by a third-party benefits administrator is causally connected to any violation of her rights under the FMLA.[6]

---

[6] The Court determines that Glymph fails to raise issues of fact as to the elements of claims for retaliation or interference under the FMLA, much less adduces evidence that CompuCom willfully

1

2

B.     Intentional Infliction of Emotional Distress (Outrage)

        To prevail on a claim for the tort of intentional infliction of emotional distress, also

known as the tort of outrage, [7] a plaintiff must show "(1) extreme and outrageous conduct, (2)

intentional or reckless infliction of emotional distress, and (3) actual result to plaintiff of severe

emotional distress." *Lyons v. U.S. Bank Nat. Ass'n*, 181 Wash. 2d 775, 792, 336 P.3d 1142,

1151 (2014) (quoting *Kloepfel v. Bokor*, 149 Wash. 2d 192, 195, 66 P.3d 630 (2003)).  The

conduct must be "[s]o outrageous in character, and so extreme in degree, as to go beyond all

possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community." *Grimsby v. Samson*, 85 Wash. 2d 52, 59, 530 P.2d 291, 295 (1975) (internal

quotation omitted).  "Although the question of whether conduct is sufficiently outrageous is

ordinarily for the jury, it is 'initially for the court to determine if reasonable minds could differ

on whether the conduct was sufficiently extreme to result in liability.'" *Lemelson v. Wells Fargo

Bank, N.A.*, 641 F. Supp. 3d 1005, 1014 (W.D. Wash. 2022) (quoting *Dicomes v. State*, 113

Wash. 2d 612, 782 P.2d 1002, 1012 (1989)).  Also, "[s]evere emotional distress is 'not transient

and trivial' but distress such that 'no reasonable [person] could be expected to endure it.'"

*Young v. Pena*, 428 F. Supp. 3d 474, 481 (W.D. Wash. 2019), *aff'd sub nom. Young v. Hauri*,

859 F. App'x 87 (9th Cir. 2021) (quoting *Kloepfel*, 149 Wash. 2d at 203).  "In opposing a motion

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

violated the FMLA.  Thus, the evidence does not suffice for any reasonable factfinder to conclude that
CompuCom intended to violate the FMLA or that the company showed reckless disregard for whether its
termination of Glymph was prohibited by the FMLA.  *See, e.g., Seifert v. Commonwealth of PA Hum.
Rels. Comm'n*, 515 F. Supp. 2d 601, 615 (W.D. Pa. 2007), *aff'd on other grounds sub nom. Seifert v.
Pennsylvania Hum. Rels. Com'n*, 301 F. App'x 194 (3d Cir. 2008) (reasoning that while the plaintiff
made a prima facie case for retaliation under the FMLA, she failed to show that her employer's conduct
willfully violated the FMLA because her employer approved her FMLA leave and the hostility between
the plaintiff and her supervisor began years before she went on leave).  The claim is thus time-barred as
well.

        [7] "Outrage and intentional infliction of emotional distress are synonyms for the same tort."
*Strong v. Terrell*, 147 Wash. App. 376, 385, 195 P.3d 977, 982 (2008) (internal quotations omitted)
(citing *Kloepfel v. Bokor*, 149 Wash. 2d 192, 193 n. 1, 66 P.3d 630 (2003)).

for summary judgment, it is the plaintiff's burden to come forward with evidence that any emotional distress was more than transient or trivial." *Id.* (citing *Kloepfel*, 149 Wash. 2d 192 at 197–98).

CompuCom contends that a "cursory reading" of the Second Amended Complaint shows that Glymph's claim for emotional distress "cite[s] to, rel[ies] on, [is] based on the same allegations as, and [is] otherwise wholly derivative of and identical to" her FMLA claims. Dkt. # 102 at 12. Glymph argues that "the actions and conduct of [CompuCom] [was] extreme and outrageous, from the time [she] went on FMLA [*sic*] for a serious health condition." Dkt. # 98. She says CompuCom "willfully intended to cause [her] financial hardship, [i]ntentional infliction of emotional distress, unjust pain, and suffering, by violating the [*sic*], WFLA, and FMLA rights [*sic*]." *Id.* She says that after she returned from FMLA leave, she was terminated from CompuCom to "add additional emotional distress, anxiety, and financial burden." *Id.*

Glymph's claim for outrage is based on her allegation that CompuCom's actions violated her FMLA rights. Thus, because the FMLA claim fails, so too does the claim for outrage.

Further, Glymph provides no evidence of conduct so outrageous or extreme "as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Grimsby*, 530 P.2d at 295. Washington cases allowing outrage claims to proceed involve actions far more outrageous or extreme than terminating an employee's employment. *See Spicer v. Patnode*, 9 Wash. App. 2d 283, 287, 443 P.3d 801, 804 (2019) (evidence supported the trial court's finding that the defendant's conduct was extreme and outrageous when, over a period of several months, he parked his car next to the plaintiff's home where she also taught piano lessons and remotely set off his car alarm when the plaintiff's piano students and their parents walked by); *cf. Dicomes*, 113 Wash. 2d at 630 (summary judgment

proper as to the employee's outrage claim when employer "privately deliver[ed] a termination letter, and briefly *respond*[ed] to media inquiries regarding the dismissal").

Moreover, to survive summary judgment, Glymph bears the burden of showing severe emotional distress. She has not done so. The evidence of emotional distress in the record is insufficient for a reasonable factfinder to conclude that Glymph suffered severe emotional distress as defined by Washington courts. Glymph's bare assertions, with no supporting evidence, that CompuCom's alleged violation of the FMLA and its termination of her employment caused her severe emotional distress is insufficient at the summary judgment stage. *See Sutton v. Tacoma Sch. Dist. No. 10*, 180 Wash. App. 859, 872, 324 P.3d 763, 770 (2014) (affirming the trial court's granting of summary judgment as to the plaintiff's outrage claim because the plaintiff "submitted no declaration or testimony claiming that she experienced emotional distress or describing the nature of that distress" and submitted no evidence showing that she "suffered any significant emotional distress that was more than transient or trivial").

C.    Motion for Sanctions

On October 8, 2024, CompuCom filed a motion for sanctions because Glymph failed to appear at her in-person deposition on October 4, 2024. Dkt. # 78. On October 30, 2024, the Court ordered Glymph to appear at her in-person deposition on November 7, 2024, and stayed CompuCom's request for attorneys' fees and costs until the conclusion of this litigation. Dkt. # 88. The Court has reviewed the materials filed in support of and in opposition to the motion, pertinent portions of the record, and the applicable law. Being fully advised, the Court DENIES the motion.

/

/

/

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT - 15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**IV**

**CONCLUSION**

For the above reasons, the Court GRANTS Defendant's motion for summary judgment. Dkt. # 95.  The Court DISMISSES Plaintiff's claims with prejudice.  The Court DENIES Defendant's motion for sanctions.  Dkts. # 78, 88.  The Court also STRIKES (1) Defendant's motion for a status conference regarding continuance of the trial date or in the alternative to extend pretrial deadlines (Dkt. # 103) as moot; and (2) Plaintiff's motion to compel (Dkt. # 106) as untimely.[8]

Dated this 22nd day of January, 2025.

_John H. Chun_
John H. Chun
United States District Judge

---

[8] In any event, the motion seeks production of an insurance policy, which would not affect the analysis in this Order.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT - 16